# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| NORTHEAST IOWA ETHANOL, L.L.C., an Iowa Limited Liability Company, | |
| Plaintiff, | No. C03-2021 |
| vs. | **ORDER** |
| JERRY DRIZIN, | |
| Defendant. | |

_____

This matter comes before the court pursuant to trial on the merits which commenced on January 23, 2006. The above-described parties have consented to jurisdiction before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The court finds in favor of the plaintiff and awards compensatory damages in the amount of $3,800,000 and punitive damages in the amount of $7,600,000.

## NATURE OF THE CASE

In this case, the plaintiff brings numerous theories of recovery against defendant Jerry Drizin arising out of the misappropriation of escrow funds that were to serve as security for financing for the construction of an ethanol plant in Manchester, Iowa. The plaintiff contends that defendant Drizin, in concert with others, knowingly converted funds from an escrow account that were not to have been spent on anything without the plaintiff's prior written permission. Defendant Drizin contends that his only client and only duty of loyalty was to a Nigerian citizen living in Munich who caused the funds to be sent to bank accounts controlled by Defendant Drizin. The court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

In 2000 in Manchester, Iowa, farmer and President of the local Co-op, Douglas Bishop, began meeting with representatives of the United States Department of Agriculture to explore the feasibility of building an ethanol plant in the Manchester area. The idea was to assist farmers in the area in getting more value for their crops. An ethanol plant produces ethanol and feed grain which can be sold at a profit exceeding that associated with the mere sale of grain.

A series of 40 local meetings culminated in a membership drive. The Plaintiff, Northeast Iowa Ethanol, L.L.C., was later formed in order to sell 2500 shares of stock in the L.L.C. to raise funds for the financing of the plant. The construction of the plant was expected to cost $21 Million. It would have a capacity for producing 15 million gallons of ethanol per year. Through the meetings, Mr. Bishop and others raised $2,365,000. The average investor purchased two shares.

The membership drive ended in September 2001. The original plan was to begin construction in the fall of 2001 and have the plant operating by the fall of 2002. However, the issue of financing for the plant was more problematic than plaintiff had anticipated. Traditional lenders (banks) demanded that the plaintiff raise forty percent of the construction costs. It was clear that the plaintiff could not raise $8 Million. Plaintiff's proposed marketing partner, Williams Ethanol Services, agreed to invest $1 Million in the project. The contractor anticipated to build the facility, North Central Construction from North Dakota, agreed to invest $500,000. In all, the plaintiff raised $3,865,000 for the construction of the plant.

When it became clear that traditional financing would not be available, the plaintiff was introduced to Dorchester Enterprises by Randy Kramer, a representative of North Central Construction. Dorchester had a representative in Sioux Center, Iowa, named Lance Booth.

Dorchester initially demanded that the plaintiff place $5 Million in an escrow account to serve as security for a $21 Million loan. No one on the board of directors of Northeast Iowa Ethanol, L.L.C. had any experience with alternative financing such as that proposed by Dorchester. In fact, it was at the suggestion of Dorchester that the Manchester cooperative became Northeast Iowa Ethanol, L.L.C.

Ultimately, Dorchester requested that plaintiff place its $3,865,000 in an escrow account as security for the financing. In October 2001 Dorchester designated Martin Ubani, a Nigerian citizen living in Munich, as the administrator for the escrow account. Ubani was formally appointed as administrator of the escrow account through a corporate resolution dated October 18, 2001, following a meeting held October 16, 2001. (Plaintiff's Exhibit 6). The terms of the corporate resolution permitted Ubani to invest the escrow account funds only with the prior written approval of the plaintiff. The terms of this resolution were accepted by Mr. Ubani. (Plaintiff's Exhibit 3A, at 5).

The resolution establishing Ubani as administrator for the funds called for plaintiff to deposit the money with Wells Fargo Bank in Des Moines, Iowa. Northeast Iowa Ethanol's $2,365,000 was wired to that Wells Fargo account on October 16, 2001. Williams' $1 Million commitment was wired to that account on November 7, 2001, and North Central Construction's $500,000 was wired on November 8, 2001. (Plaintiff's Exhibit 22).

In every financial scam like that perpetrated on the plaintiff here, there comes a point at which the victim must make an exceedingly quick decision and seemingly, the entire fate of the project depends on taking that leap of faith. From that point on, very bad things follow and only time will tell what they are. This case is no different. On November 11, 2001, the project manager for Northeast Iowa Ethanol, Douglas Schulte, received a letter from Dorchester Enterprises. It requested that all of the escrow funds in the Wells Fargo account be immediately transferred to the AM South Bank in Florida. It was represented that Dorchester needed to combine plaintiff's funds with other funds in

order to secure the acquisition of a large loan. Dorchester represented that the funds would be replaced by a letter of credit sent to the Wells Fargo account within ten to fifteen days after confirmation of receipt of the plaintiff's funds in Florida. Dorchester represented that the financing had been approved for the plaintiff and implored that the escrow funds had to be transferred immediately to Florida, or the lender would withdraw. (Plaintiff's Exhibit 18). Dorchester sent an unexecuted version of the proposed letter of credit. (Plaintiff's Exhibit 19). Of course, no executed letter of credit ever followed.

In early 2001, Defendant Jerry Drizin set up Defendant Global Syndicate International, Inc. (GSI). Drizin met his partner in GSI, Peter Topol, in February 2001 in Las Vegas, Nevada. GSI was capitalized with $250 and Topol became the 100 percent owner of the shares of the corporation organized under Nevada law. Ultimately, Defendant Drizin was appointed treasurer of the corporation because, in Drizin's words, "Topol could not even keep his own checkbook." Topol did not have a credit card because of severe financial problems that Defendant Drizin attributes to a divorce. Drizin had little experience buying investments beyond his own life insurance policy. Mr. Drizin claims that GSI was formed for the purpose of buying and selling commercial paper and to assist others in financing and the acquisition of venture capital.

Drizin had absolutely no experience in buying and selling commercial paper. He is a high school graduate who has worked as an insurance and real estate broker. Drizin has never been licensed to sell any investment and has never been a stockbroker. GSI purchased no errors and omissions insurance and Drizin did nothing to investigate the background of Peter Topol. However, Drizin admitted that, as a real estate broker, he understood the purpose and sanctity of an escrow account.

Topol then told Drizin about Martin Ubani. He described Ubani as a friend in the area of international finance who could locate commercial paper that GSI could buy at a discount and sell at a profit. Topol wanted Ubani to be an officer in GSI, but Drizin refused. Instead, Ubani became a consultant to the corporation. Drizin did nothing to

investigate Ubani. Ubani began using GSI stationery, to which GSI did not object, even as it was clear that Ubani was converting plaintiff's escrow funds.

Minutes of the October 20, 2001 GSI board of directors meeting reflect that Ubani had entered into an agreement with Northeast Iowa Ethanol to be the administrator and manager of funds held on deposit at the Wells Fargo Bank in Des Moines for a period of thirteen months. (Defendant's Exhibit J). The minutes also reflect that Ubani approached Peter Topol and Jerry Drizin, proposing that GSI assist in the investment of the funds. (Defendant's Exhibit J). GSI was provided a copy of the Northeast Iowa Ethanol corporate resolution indicating that the funds were only to be invested with prior written approval from the plaintiff and Ubani's acceptance of that arrangement (Defendant's Exhibits H & I).

In a wire transaction dated November 13, 2001, $3,800,000 of plaintiff's funds were transferred to the AM South Bank account of GSI for which Defendant Jerry Drizin was the only signatory. (Plaintiff's Exhibit 95, at 20). Following the receipt of the $3,800,000 on November 13, 2001, $2 Million was sent on November 19, 2001, to the Trust Account of the Greenspoon law firm in Florida for the benefit of a company called Gravity Entertainment and its principal, Michelle Arsenault. This was done pursuant to the instructions of Martin Ubani and a $2 Million "guarantee" that Ubani had given Arsenault on GSI letterhead on November 6, 2001.

There was absolutely no information given to Mr. Drizin as to what was being guaranteed and why GSI would wire $2 Million to Ms. Arsenault as a part of a guarantee. No one ever claimed that Michelle Arsenault had done, or would do, anything for Northeast Iowa Ethanol. Mr. Drizin now claims to have no explanation for what he did other than to say that Mr. Ubani was his client and that Mr. Ubani assured GSI that the money would be replaced shortly. Despite the fact that Mr. Drizin knew of the corporate resolution requiring prior written approval from the plaintiff for placement of the funds, no written permission was received by Drizin, nor was there any evidence that Ubani had

received it.  Although Drizin claims to have considered contacting Northeast Iowa Ethanol, he says he did not do so because Martin Ubani forbade him from having any such contact.

The same day that the $2 Million was wired out, minutes of a special board meeting of GSI recorded the details of the transfer of $3.8 Million to GSI's escrow account.  Those minutes state:

> Mr. Ubani advised us that the purpose of this transfer is for Global Syndicate International, Inc. to assist Mr. Ubani in the <u>safe investment</u> of these funds. . . .  Global Syndicate International, Inc., will receive into it's [sic] escrow account from Martin Ubani the amount of $3,800,000.00 under the terms of Ubani's corporate resolution with Northeast Iowa Ethanol, LLC.

(Defendant's Exhibit GGG, emphasis added).  As noted above, GSI had both the corporate resolution requiring prior written approval from the plaintiff prior to any transaction utilizing the plaintiff's funds (Defendant's Exhibit H), and it had Martin Ubani's acceptance of the terms of that appointment on GSI, Inc. letterhead.  (Defendant's Exhibit I).

As if this transaction was not strange enough, GSI created a promissory note falsely indicating that it had borrowed $3,865,000 from Northeast Iowa Ethanol and delivered it to Martin Ubani.  (Defendant's Exhibit O).  The date of the note is November 15, 2001.  However, the date of the signature on the note is December 11, 2001.  It is signed by Peter Topol.  Defendant Drizin contends that he contemporaneously wrote the word "Error" on the note and initialed it as such on November 15, 2001.  So, GSI was supposed to be assisting Martin Ubani in securing safe investments for Northeast Iowa's escrow money while Dorchester lined up financing for the construction of the ethanol plant.  Instead, GSI almost immediately sent $2 Million to the law firm representing an entertainment company to "guarantee" some unknown obligation for a woman who had earlier mysteriously placed $155,000 in GSI's escrow account without herself getting any documentation, shares of

stock, a business plan, or anything else.[1]  The so-called investment brokers at GSI then gave a promissory note for the funds placed with them.

Of course, nothing described above regarding these transactions remotely resembles any legitimate business investment, advice, or transaction.  According to Mr. Drizin, Ubani continually promised that the money would be completely accounted for and returned within a couple of weeks.  When Ubani refused to perform, Drizin got concerned.  Not concerned enough to notify the company whose millions were missing,  but concerned just the same.  Ubani then personally directed Mr. Drizin to send another $1 Million to Michelle Arsenault on December 15, 2001.  Mr. Drizin refused to do so, indicating that Mr. Ubani had not fulfilled the terms of the November 19, 2001, agreement.

Throughout the trial, one of Mr. Drizin's three mantras was that his only fiduciary obligation was to serve Mr. Ubani who had placed the funds with GSI.  However, by mid-December, Drizin refused to comply with Ubani's directives and was not communicating with the plaintiff either.  By December 24, 2001, GSI resolved to hire attorney Arnulfo Acosta to pursue the return of the $2 Million from Mr. Ubani.  (Defendant's Exhibit Y).  Mr. Acosta, according to Mr. Drizin, later became Mr. Ubani's lawyer and GSI fired him.

On December 27, 2001, another attorney for GSI, Barry Marvel, brought it to GSI's attention that two written guarantees made to Michelle Arsenault by Martin Ubani made no business sense.  Mr. Marvel subsequently had more than half a million dollars of the plaintiff's money directed to his trust account.  By December 31, 2001, GSI suspended Mr. Ubani's position as a consultant in the corporation.  (Defendant's Exhibit FF).

By the end of December 2001, there should have been approximately $1.8 Million in the GSI escrow account.  Unfortunately, however, the GSI special board of directors

---

[1]Martin Ubani persuaded a woman named Michelle Arsenault to send $30,000 to GSI as seed money to begin GSI's business of buying and selling commercial paper.  On September 21, 2001, Ms. Arsenault sent $30,000 to GSI's escrow account.  She sent an additional $125,000 at a later date.  She was informed that the money would be used to secure greater funds for her.

meeting minutes for October 20, 2001, indicate that all of GSI's expenses in the operation of the escrow account could be deducted from the deposited funds. Accordingly, Mr. Drizin testified that only $798,000 was left after paying expenses, attorney's fees, travel, salaries, and "verification" expenses.

Within eight days of receiving plaintiff's $3.8 Million, GSI had moved over $3 Million out of the escrow account. Two Million Dollars had gone to Michelle Arsenault as identified above. On November 20, 2001, Mr. Drizin moved $512,741.06 to GSI's "travel and expense account." (Plaintiff's Exhibit 95, at 18). The expenditures from that account are detailed in Plaintiff's Exhibit 94. On November 21, 2001, Mr. Drizin sent another $500,000 to attorney Barry Marvel in Utah. (Plaintiff's Exhibit 95, at 18). Mr. Drizin explained at trial was that he sent the money to Barry Marvel because he was having problems with Martin Ubani and needed to diversify the plaintiff's portfolio. It is hard to accept this explanation given the fact that only two days earlier, GSI had sent $2 Million to Michelle Arsenault. Mr. Drizin then frittered away the remaining $1.8 Million over the next four months.

The GSI travel and expense account referenced above was opened in November 2001 with a zero balance. It was funded with the $512,000 that Mr. Drizin sent to the account, as well as $25,000 that had come back from Mr. Marvel on the same day that GSI was so desperate to send Marvel $500,000 in an alleged attempt to protect the plaintiff's funds. Of the approximately $537,000 transferred into the travel and expense fund, GSI immediately sent $300,000 to an escrow account maintained by Jerry Drizin's other company, Associated Business Group in the Republic Bank of Largo, Florida. Mr. Drizin assigned GSI's business to Associated Business Group,[2] but not until January 10, 2002. (Defendant's Exhibit LL). An additional $25,000 was sent to Associated Business Group's

---

[2] Bank after bank closed GSI's accounts, so he transferred the money to a bank that would accept his deposits.

operating account, $2,000 was sent to a lawyer for representation in the Bahamas, and $25,000 was sent again to Barry Marvel.

From the Republic Bank's escrow account, Mr. Drizin immediately began writing large checks that, not surprisingly, have nothing to do with safeguarding the plaintiff's funds. Checks for tens of thousands of dollars were written to lawyers such as Mr. Acosta, Defendant Jesse Erwin, and Barry Marvel. Mr. Drizin provides no explanation as to what actions were taken on behalf of the plaintiff, he presents no bills from the lawyers, and offers no other explanation for these expenditures.

Hundreds of thousands of dollars were sent to a man named Ken Walls. According to Defendant Drizin, Mr. Walls was pursuing a gold mining operation in Nevada. Using plaintiff's funds, Defendant Drizin contends that Ken Walls purchased land and equipment to mine gold. Drizin never demanded that title to anything be put in the name of the plaintiff or even GSI. Drizin testified that he permitted Mr. Walls to title everything in his own name.[3] Drizin's explanation for this behavior gives rise to his second trial mantra. Drizin contends that he was sick with cancer and simply could not tend to such details. According to Mr. Drizin's testimony, Mr. Walls then liquidated everything and ran off with the plaintiff's money. Mr. Walls was not, and has never been, pursued by Drizin or GSI. In the face of this conduct, Mr. Drizin resorts to his third trial mantra, which is that he acted in "good faith" and therefore is protected from personal liability pursuant to Nevada law.

In addition to Mr. Drizin's claim that he invested plaintiff's funds in a worthless gold mine, he also claims that he spent many hundreds of thousands of dollars purchasing a judgment from Mr. Walls. In 1992, Kenneth Walls received a default judgment against the J.G. White Company in the amount of $15,864,264.89, together with interest at 10 percent. Mr. Drizin contends that the amount of the judgment with interest now

---

[3] According to Drizin, all of Mr. Walls' receipts were stolen from a suitcase left in the back of a pickup truck parked outside Walls' motel.

exceeds $40 Million. Mr. Drizin testified that he paid $450,000 to purchase that judgment. However, he also identified two $250,000 checks used to purchase it. Mr. Drizin testified that he did absolutely nothing to verify the actual existence or collectability of the judgment, and made no effort to determine the real value of the paper. Rather, he simply states that he took Mr. Walls' word for the fact that the judgment was good and could be executed upon. He still claims that it can be collected, but estimates that collection costs would be three to four million dollars.

Mr. Drizin is articulate, intelligent, and is nobody's fool. No one with his level of sophistication would pay hundreds of thousands of dollars for a ten-year-old judgment without any legitimate investigation. While Mr. Drizin may have received an assignment of that judgment (Defendant's Exhibit AAA), the court simply does not believe that the assignment of the judgment is the real reason why Mr. Drizin sent Mr. Walls hundreds of thousands of dollars.

Mr. Drizin also sent $150,000 to Defendant Jesse Erwin, an attorney whom Drizin claims to have hired after Mr. Marvel and Mr. Acosta were fired by GSI. Mr. Drizin testified that he sent Mr. Erwin $150,000 to purchase a five percent interest in a company called eGolfTrends. According to Mr. Drizin's testimony, eGolfTrends had a unique idea that was to be sold to Nike for a large amount of money, i.e., golf spikes that could be affixed to golf shoes by screwing them into the sole of the shoe instead of simply pushing them into the shoe. The undersigned can only speak to the construction of golf shoes since approximately 1965. However, since at least that time, spikes have been affixed by screwing them into the sole of a shoe. Those metal spikes from earlier days have since been replaced by rubber spikes that have also been consistently screwed into the soles of golf shoes. Mr. Drizin testified at trial that he is not a golfer.

Another one of the so-called "safe investments" purchased by Mr. Drizin was a $45,000 contract for jet fuel with a London doctor. That investment yielded the same result as every single other payment from plaintiff's escrow account. In fact, the record

reveals that a woman named Tiffany Bacon got more of plaintiff's $3.8 Million to date than has the plaintiff.

A tremendous amount of money was spent by Mr. Drizin in the Bahamas. According to Mr. Drizin, he wanted to establish a $50 Million line of credit and contacted a man named Al Weiss to arrange a meeting with Arab-Anglo Holdings in Nassau, Bahamas. Mr. Drizin's partner, Mr. Topol, had an instrument from Banco DeBrazil that was to serve as collateral for this $50 Million line of credit. Topol and Drizin also went to London to pursue this line of credit. Because of scandals concerning commercial paper from South America, Mr. Drizin claims that he spent $5,000 to verify the legitimacy of Mr. Topol's commercial paper and paid a non-refundable fee of $100,000 for representation as a part of his attempt to secure the line of credit. Of course, the paper was worthless. Mr. Topol had been rendered insolvent by his divorce and could not even get a credit card. Bank after bank closed accounts maintained by GSI after visits from the various fraud departments and GSI's presentation of other fraudulent commercial paper.

Numerous people were hired by GSI for $2,500 to $4,000 per month. According to Mr. Drizin, these people included a "lady friend" of Mr. Topol in Florida, a former Madagascar ambassador, and others. Checks for tens of thousands of dollars were written for cash, to relatives of Ken Walls, and some money even went to attorney Erwin's mother for her medical expenses. Twenty thousand dollars was sent to the defendant's son for purchase of stock in his son's company. Mr. Drizin proudly testified that a handsome "profit" was made on the stock, until the price of that stock tanked. He claims that the shares are currently worth six cents each but that it is poised to rebound. Of course, over the years the thought has not occurred to Mr. Drizin that the shares should have been put in the plaintiff's name or transferred to it.

Meanwhile, the plaintiff and its attorney, Dan Waters, were very concerned about what had happened to the escrow funds. They learned of the $2 Million transfer to Michelle Arsenault and wanted to do everything they could to get it back. They were

constantly assured by Ubani and others that the financing was in place and that the funds would be returned in a few days. On February 12, 2002, attorney Jesse Erwin, corporate counsel for Global Syndicate International, Inc., sent Mr. Waters a letter informing Mr. Waters that:

> My client has invested the remaining $1,800,000.00 USD in various investment transactions that have the potential to earn better than average returns on investment. My client has entered into contractual obligations regarding these investments and could face legal actions if these contractual obligations are compromised in any manner. Global Syndicate International, Inc. intends to honor its Promissory Note to Martin Ubani, Northeast Ethanol, LLC's authorized representative, without fail on the due date.

(Plaintiff's Exhibit 38). That information was provided by Mr. Drizin or his agent, Mr. Erwin. Mr. Erwin settled before trial and did not attend the trial. In any event, not one word of the letter was true. By mid-February, almost all of the $1.8 Million was gone. By mid-April, all of it was gone. In keeping with his second mantra, Mr. Drizin testified that he simply was too sick to pay attention to Mr. Erwin's letter.

Prior to the commencement of trial and in his closing argument, Mr. Drizin protested that he could not get a fair trial without the presence of the codefendants. He did not suggest that any of the codefendants would exonerate him. Rather, he simply implied that they were more culpable. To the extent necessary for a finding of liability, the facts set forth above were derived almost exclusively from Mr. Drizin's exhibits and Mr. Drizin's testimony. Rather than being hampered by the unavailability of codefendants, the court believes that it was more likely that Mr. Drizin benefitted from the absence of the others. That is, the codefendants were not there to dispute any disparaging statements made by the plaintiff. Mr. Drizin's liability was established by Mr. Drizin's testimony, by exhibits created by him, and with bank records that he admits were for accounts for which he was the only authorized signatory.

In many places in the Findings of Fact above, the court was careful to simply reiterate Mr. Drizin's testimony rather than to make a finding that the testimony was believable. Specifically, when Mr. Drizin indicated that he made investments in a failed gold mine, the novel idea of screw-in golf spikes, jet fuel from a London doctor, and a line of credit in the Bahamas, the court does not necessarily believe that these investments were truly made. However, even if this testimony were truthful, it is certainly supportive of the plaintiff's fraud, conversion, and breach of fiduciary duty claims.

## CONCLUSIONS OF LAW

### Piercing the Corporate Veil

Generally a corporation is a distinct entity from its shareholders. Northwestern Nat. Bank of Sioux City v. Metro Center, Inc., 303 N.W.2d 395, 398 (Iowa 1981). This distinction usually insulates shareholders from personal liability for corporate debts. Briggs Transportation Co., Inc. v. Starr Sales Co., Inc., 262 N.W.2d 805, 809 (Iowa 1978). However, this protection is not absolute. Personal liability may be imposed upon shareholders in "exceptional circumstances." Newberry v. Barth, Inc., 252 N.W.2d 711, 714 (Iowa 1977).The corporate veil may be pierced, for example, "where the corporation is a mere shell, serving no legitimate business purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice. Id.

Factors used in Iowa law to support a finding exceptional circumstances are outlined in Lakota Girl Scout C., Inc v. Harvey Fund-Rais. Man., Inc., 519 F.2d 634 (8th Cir. 1975):

> (1) the corporation is undercapitalized;

> (2) the corporation lacks separate books;

> (3) its finances are not kept separate from individual finances,
> or individual obligations are paid by the corporation;

> (4) the corporation is used to promote fraud or illegality;

(5) corporate formalities are not followed; or

(6) the corporation is a mere sham

(citing 1 W.M. Fletcher, Cyclopedia of the Law of Private Corporations, § 41.3 (1974)). This list is not meant to be exhaustive. Boyd v. Boyd & Boyd, 386 N.W.2d 540, 544 (Iowa 1986). Concerns for justice and equity can also be taken into account by a court in determining whether to pierce the corporate veil. Id.

If a corporation lacks substantial capital such that it would not be able to meet its debts, this is a ground for denying the privilege of separate entity. Briggs Transp. Co., Inc. v. Starr Sales Co., Inc., 262 N.W.2d 805, 810 (Iowa 1978) (citing Ballantine Corporations, § 129, pp. 302-303 (rev. ed. 1946)). "If capital is illusory or trifling compared with the business to be done and the risk of loss, this is a ground for denying the separate entity privilege." Id. Secondly, if corporate funds are not segregated, there is a strong inference that they are being used by the shareholders for their individual purposes. Id. at 810-11. "[A] major corporate officer [can] not avoid liability be emulating the three fabled monkeys, hearing, seeing and speaking no evil." Id. at 811.

Without question, this case presents the "exceptional circumstance" warranting the piercing of GSI's corporate veil and finding Mr. Drizin personally liable for GSI's misdeeds, as the sole purpose of establishing GSI was to perpetuate fraud. GSI engaged in no legitimate business transactions whatsoever, a fact that was not lost on the fraud departments of the several banks who closed GSI's accounts and refused to do further business with GSI. The $250.00 initial capitalization of GSI is, in fact, "trifling compared with the business to be done and the risk of loss." Briggs Transp., 262 N.W.2d at 810. GSI had no errors and omissions insurance. Mr. Drizin used GSI's accounts as his own, constantly transferring money from the GSI escrow account to his personal accounts for "reimbursement" and to other accounts for "safekeeping" and "diversification." And now, GSI is a defunct corporation. Justice and equity call for piercing the corporate veil.

**Conversion**

To prevail on a claim of conversion, the plaintiff must prove:

> (1) ownership by the plaintiff or other possessory right in the plaintiff greater than that of the defendant;
>
> (2) exercise of dominion or control over chattels by defendant inconsistent with, and in derogation of, plaintiff's possessory rights thereto; and
>
> (3) damages.

Estate of Bearbower v. Bearbower, 426 N.W.2d 392, n. 1 (Iowa 1988)(citing Welke v. City of Davenport, 309 N.W.2d 450, 451-52 (Iowa 1981); Merchants and Farmers State Bank v. Rosdail, 131 N.W.2d 786, 790 (1964), opinion clarified 136 N.W.2d 287 (1965); 18 Am. Jur.2d Conversion, § 2 (1985)).

Defendant's control must amount to a serious interference with the plaintiff's right to control the property. Kendall/Hunt Publ'g Co. v. Rowe, 424 N.W.2d 235, 247 (Iowa 1988)(citing Restatement (Second) of Torts § 222A(1) (1965)). Factors to be considered in determining the seriousness of defendant's interference are:

> (1) the extent and duration of the actor's exercise of dominion and control;
>
> (2) the actor's intent to assert a right in fact inconsistent with the other's right of control;
>
> (3) the actor's good faith;
>
> (4) the extent and duration of the resulting interference with the other's right of control;
>
> (5) the harm done to the chattel; and
>
> (6) the inconvenience and expense caused to the other.

Id. at 247 (quoting Restatement (Second) of Torts § 222A(2)).

Conversion can be committed "by obtaining the chattel through fraud or by using a chattel, properly within one's control, in an unauthorized manner." <u>State v. Hollinrake</u>, 608 N.W.2d 806, 808 (Iowa. Ct. App. 2000)(citing Restatement (Second) of Torts § 221(b), 228). In addition, there must also be a causal connection between the defendant's actions and the damage to the plaintiff, which is essentially probable cause. <u>State v. Starkey</u>, 437 N.W.2d 573, 574 (Iowa 1989).

Through his experience as a real estate broker and life insurance salesman, Mr. Drizin clearly and admittedly understood the function of an escrow account. He knew the intended purpose of plaintiff's escrow funds, i.e., security for further financing. Mr. Drizin knew from the corporate resolution that plaintiff's funds were only to be placed in <u>safe</u> investments, and only with the prior written permission of the plaintiff. Mr. Drizin knew nothing about the Nigerian citizen he utilized as a "consultant " to GSI and at whose direction he immediately wired $2 Million of plaintiff's money under suspicious circumstances. It defies common sense that a broker would legitimately charge $512,000 in "expenses" for investing $3.8 Million when not a single "investment" yielded one cent in return. The transfer to Michelle Arsenault makes no sense. Neither do the gold mine, the golf spikes, or the Bahamian line of credit. These were not "safe" investments by any stretch of the imagination. None were even made or titled in plaintiff's name. Rather, they were ridiculous, self-dealing scams which served to fritter away plaintiff's $3.8 Million within a matter of a few months. None of Mr. Drizin's actions were taken in good faith. To this day, plaintiff has yet to see a nickle of its money. This is conversion for which Mr. Drizin is liable.

## Breach of Fiduciary Duty

In order to succeed on a breach of fiduciary duty claim, the plaintiff must prove : "(1) the existence of a fiduciary relationship; and (2) that the [actions taken by the fiduciary] were not beneficial to his or her interests." <u>Vos v. Farm Bureau Life Insurance</u>

Company, 667 N.W.2d 36, 52 (Iowa 2003)(quoting Rothwell v. Chubb Life Ins. Co., 191 F.R.D. 25, 32 (D.N.H. 1998)).

A fiduciary relationship exists "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Kurth v. Van Horn, 380 N.W.2d 693, 695 (Iowa 1986)(citing Restatement (Second) of Torts § 874 cmt. a, at 300 (1979)). Indicia of a fiduciary relationship include:

> (1) the acting of one person for another; (2) the having and the exercising of influence over one person by another; (3) the reposing of confidence by one person in another; (4) the dominance of one person by another; (5) the inequality of the parties; and (6) the dependence of one person upon another.

Kurth, 380 N.W.2d at 696 (quoting First Bank of Wakeeney v. Moden, 235 Kan. 260, 262, 681 P.2d 11, 13 (1984); 36A C.J.S. Fiduciary, at 386-87 (1961)).

A fiduciary relationship has also been defined as:

> [a] very broad term embracing both technical fiduciary relations and those informal relations which exist wherever one man trusts in or relies upon another. One founded on trust or confidence reposed by one person in the integrity and fidelity of another. A "fiduciary relation" arises whenever confidence is reposed on one side, and domination and influence result on the other; the relation can be legal, social, domestic, or merely person. Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of the other.

Id. at 696-97 (quoting Black's Law Dictionary 564 (5th ed. 1979)). "Because the circumstances giving rise to a fiduciary duty are so diverse, any such relationship must be evaluated on the facts and circumstances of each individual case." Id. (citing 70 A.L.R.3d 1344, 1347-48 (1976)).

Ubani was GSI's consultant and agent. Mr. Drizin's fiduciary duty ran to the plaintiff as the owner of the funds that GSI was to be holding and safely investing, not to Ubani who did nothing more than refer the business to GSI. Again, Mr. Drizin was

admittedly aware that the plaintiff's funds were only to be put into safe investments, i.e., the parameters expressly agreed to by Ubani. Mr. Drizin breached his fiduciary duty to the plaintiff with every dollar he either self-dealt or allowed to be squandered away. For example, investing in a gold mine and not putting title to any of the land or equipment in plaintiff's name was a breach of Drizin's fiduciary duty to plaintiff. Not investigating the "novel" golf spike investment was another breach of Drizin's fiduciary duty, as was his failure to investigate the value of the worthless judgment he purchased with $450,000 - $500,000 of plaintiff's money, and Drizin's payment of tens, if not hundreds thousands of dollars in legal fees. At trial, Drizin could provide no specifics as to the legal services purportedly provided or the actual or reasonable value of same. Mr. Drizin had a fiduciary duty to the plaintiff in this case, he breached that duty repeatedly, and he is therefore liable.

### Fraudulent Misrepresentation

To establish a claim of fraudulent misrepresentation the plaintiff must prove:

(1) [the defendant] made a representation to [the plaintiff];

(2) the representation was false;

(3) the representation was material;

(4) [the defendant] knew the representation was false;

(5) [the defendant] intended to deceive [the plaintiff];

(6) [the plaintiff] acted in reliance on the truth of the representation and was justified in relying on the representation;

(7) the representation was the proximate cause of [the plaintiff's] damages; and

(8) the amount of damage.

Midwest Home Distributor, Inc. v. Domco Industries Ltd., 585 N.W.2d 735, 737 (Iowa 1998)(citing Magnusson Agency v. Public Entity Nat'l Company-Midwest, 560 N.W.2d 20, 27-28 (Iowa 1997)). Generally, each of these elements must be proved by a

preponderance of clear, satisfactory, and convincing evidence. Id. However, in cases of equity, "[f]raud may there be constructed from circumstances, whereas the law must find it as a fact. Furthermore, equity may grant relief absent a showing of scienter or pecuniary damage." Wilden Clinic, Inc. v. City of Des Moines, 229 N.W.2d 286, 292 (quoting First National Bank in Lenox v. Brown, 181 N.W.2d 178, 181 (Iowa 1970)). Circumstantial evidence may be used to prove a representation, falsity, materiality, intent to deceive, and reliance. Id.

A fact is material "when it influences a person to enter into a contract, when it deceives him and induces him to act, or when without it the transaction would not have occurred." Id. (quoting Rosenberg v. Mississippi Valley Constr. Co., 106 N.W.2d 78, 80 (Iowa 1961)).

Drizin, through his agent, Martin Ubani, represented to the plaintiff that its funds would only be put in safe investments, and then only with plaintiff's prior written approval.[4] This representation was both false and material, and Ubani knew it was false when the representation was made. Drizin and Ubani intended to deceive the plaintiff, as is obvious by the speed with which they violated the corporate resolution and began

---

[4]Drizin hired Ubani to act as a consultant to GSI. Ubani sent communications to the plaintiff on GSI letterhead. Drizin now claims that Ubani forged GSI's letterhead, a claim the court does not believe. On Ubani's oral instruction, Drizin wired $2 Million dollars of plaintiff's money to a law firm's trust account for the benefit of an entertainment company. The court finds that Ubani was Drizin's agent, possessing both the actual and apparent authority to bind GSI and Drizin with his actions. See Desy v. Rhue, 462 N.W.2d at 742, 747 (Iowa Ct. App. 1990) ("An agency results from the manifestation of consent by one person, the principal, that another, the agent, shall act on the former's behalf and subject to his control, and consent by the other so to act."); Thorp Credit, Inc. v. Wuchter, 412 N.W.2d 641, 646 (Iowa Ct. App. 1987) (noting that an agency relationship can be proved from the parties' "words and conduct, from which an intention to create an agency may be implied"); Giese Constr. Co., Inc. v. Randa, 524 N.W.2d 427, 431 (Iowa Ct. App. 1994) ("For apparent authority to exist the principal must have acted in such a manner as to lead persons dealing with the agent to believe the agent has authority.").

spending plaintiff's money, without plaintiff's knowledge or permission, on anything and everything but safe investments. Drizin and Ubani were clearly not acting in good faith when they agreed to hold and invest plaintiff's money. But for the misrepresentation, which plaintiff justifiably relied upon, the plaintiff never would have transferred the funds to GSI's account. The evidence is clear and convincing that Drizin, through his agent Martin Ubani, fraudulently represented to the plaintiff his intentions with respect to plaintiff's money. Drizin is liable.

### Fraudulent Omission

A fraudulent representation need not be an affirmative statement. Fraud can arise just as easily from a failure to disclose material facts. Sinnard v. Roach, 414 N.W.2d 100, 105 (Iowa 1987)(citing Cornell v. Wunschel, 408 N.W.2d 369, 374 (Iowa 1987)). Therefore, the elements of fraudulent omission are the same as for fraudulent misrepresentation. The plaintiff must establish:

> (1) representation;
>
> (2) falsity;
>
> (3) materiality;
>
> (4) scienter;
>
> (5) intent to deceive
>
> (6) reliance; and
>
> (7) resulting injury and damage.

Anderson v. Boeke, 491 N.W.2d 182, 188 (Iowa App. 1992)(citing Robinson v. Perpetual Servs. Corp., 412 N.W.2d 562, 565 (Iowa 1987); Cornell, 408 N.W.2d at 374; Beeck v. Kapalis, 302 N.W.2d 90,94 (Iowa 1981))

The omission must "relate to a material matter know to the party…which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other

attendant circumstances." <u>Wilden Clinic Inc. v. City of Des Moines</u>, 229 N.W.2d 286, 293 (Iowa 1975).

Once it became apparent that GSI was not to be trusted, the plaintiff commenced efforts to recoup from GSI what was left of its funds, i.e., the $1.8 Million left after Ubani's initial $2 Million withdrawal. Plaintiff's corporate attorney, Dan Waters, was met with nothing but ongoing lies about the status of the remaining funds. Specifically, Drizin failed to disclose that there was any of plaintiff's money even left to recover. By failing to disclose this fact, Drizin intended to deceive the plaintiff into foregoing further collection efforts. Drizin's actions in this regard constitute fraudulent omission.

### Negligent Misrepresentation:

The state of Iowa has adopted the Restatement (Second) of Torts definition of negligent misrepresentation. Section 552 provides that the elements for the tort of negligent misrepresentation are:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) …[T]he liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Barske v. Rockwell International Corp., 514 N.W.2d 917, 924 (Iowa 1994); Larsen v. United Fed. Sav. & Loan Ass'n of Des Moines, 300 N.W.2d 281, 287 (Iowa 1981); Beeck v. Kapalis, 302 N.W.2d 90, 97 (Iowa 1981); Restatement (Second) of Torts § 552 (1977).

"Reliance upon the information is justifiable if a person acting with reasonable and ordinary prudence and caution would have a right to rely on the representations." Pollmann v. Belle Plaine Livestock Auction, Inc., 567 N.W.2d 405, 410 (Iowa 1997)(quoting Kaiser Agricultural Chemicals v. Ottumwa Production Credit Ass'n, 428 N.W.2d 681, 683 (Iowa App. 1988)).

There is a restricted rule of recovery in cases where the negligent act results only in pecuniary harm, due to the fear of unlimited liability. Sain v. Cedar Rapids Community School, 626 N.W.2d 115, 123 (Iowa 2001)(citing Restatement (Second) of Torts § 552 cmt. a (1977); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 105, at 725-26, § 107, at 745 (5th ed. 1984)). A defendant is not liable to all persons who may be expected to use the information, but only to those who are actually foreseen. Beeck, 302 N.W.2d at 97 (citing Ryan v. Kanne, 170 N.W.2d 395, 403 (Iowa 1969).

Because this is an action in negligence, the defendant must owe a duty of care to the plaintiff to establish liability for negligent misrepresentation. Sain, 626 N.W.2d at 124. Iowa courts have determined that a duty arises only when the defendant is in the business or profession of supply information to others and the parties are not involved in an adversarial relationship. Id. (citing Hendricks v. Great Plains Supply Co., 609 N.W.2d 486, 492 (Iowa 2000); Meier v. Alfa-Laval, Inc., 454 N.W.2d 576, 581-82 (Iowa 1990); Molo Oil Co. v. River City Ford Truck Sales, Inc., 578 N.W.2d 222, 227 (Iowa 1998); Fry v. Mount, 554 N.W.2d 263, 265-66 (Iowa 1996); Freeman v. Ernst & Young, 516 N.W.2d 835, 838 (Iowa 1994); Haupt v. Miller, 514 N.W.2d 905, 910 (Iowa 1994)).

The plaintiff must also prove that the information provided by the defendant was the proximate cause of provable damages to the plaintiff's pecuniary interest. Sain, 626 N.W.2d at 127. To show proximate cause a plaintiff must establish that, but for the

defendant's negligence, the plaintiff's injury would not have occurred. <u>Hasselman v. Hasselman</u>, 596 N.W.2d 541, 545 (Iowa 1999).

GSI's stated purpose was to buy and sell commercial paper and to assist others in financing and with the acquisition of venture capital. It was under this guise that the plaintiff allowed GSI to manage its funds. As set forth above, GSI owed a fiduciary duty and the ensuing standard of care to the plaintiff. Drizin's actions with respect to plaintiff's money, while already determined to have been intentional, were clearly negligent as well. And but for Drizin's negligence, plaintiff would not have been damaged. Specifically, Drizin's negligence was illustrated by his lack of skill in investments, his utter lack of communication with the plaintiff, his lack of compliance with generally accepted investment standards and goals, the absence of any security for the money he placed, and his lack of due diligence in investigating any of plaintiff's money that he spent. Drizin is liable for negligent misrepresentation.

## Punitive Damages

In Iowa, punitive damages are recoverable in order to "punish the party against whom they are awarded and to deter others from similar wrongdoing." <u>Grefe v. Ross</u>, 231 N.W.2d 863, 868 (Iowa 1975). Punitive damages may be awarded for fraud. <u>See</u> <u>C. Mac Chambers Co. v. Iowa Tae Kwon Do Academy, Inc.</u>, 412 N.W.2d 593, 599 (Iowa 1987). To support an award of punitive damages, a tort must be committed with either actual or legal malice. <u>Parks v. City of Marshalltown</u>, 440 N.W.2d 377, 379 (Iowa 1989). Actual malice may be shown by such things as personal spite, hatred, or ill-will. <u>Id.</u> Legal malice may be shown by wrongful conduct committed with a willful or reckless disregard for the rights of another. <u>Id.</u> A plaintiff seeking punitive damages must prove malice by a preponderance of clear, convincing, and satisfactory evidence. Iowa Code § 668A.1(1)(a); <u>Hockenberg Equip. Co. v. Hockenberg's Equip. & Supply Co.</u>, 510 N.W.2d 153, 156 (Iowa 1993).

In deciding on the amount of a punitive damage award, a court applying Iowa law should consider traditional factors such as: (1) the extent and nature of the outrageous conduct; (2) the amount necessary for future deterrence; and (3) the relationship between the punitive award and the plaintiff's injury, as reflected in any award for compensatory damages. See Jones v. Lake Park Care Center, Inc., 569 N.W.2d 369, 378 (Iowa 1997)(quoting Ezzone v. Riccardi, 525 N.W.2d 388, 399 (Iowa 1994)). In addition, the court should consider "all circumstances surrounding the conduct and relationship between the parties" and "any provocation of the [defendant's] conduct by the plaintiff." Ezzone, 525 N.W.2d at 399. Iowa courts have defined provocation to include participation in the conduct complained of. Id.

A court must also review a punitive damage award according to the reasonableness standards of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 17, 111 S. Ct. 102, 113 L. Ed. 2d 1 (1991). In calculating punitive damages, the Supreme Court has observed that it is appropriate to consider "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from defendant's conduct as well as the harm that actually occurred." TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 460, 113 S. Ct. 2711, 2721, 125 L. Ed. 2d 366, 381 (1993). The Court has also stated that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." BMW of North America, Inc. v. Gore, 517 U.S. 559, 570, 116 S. Ct. 1589, 1599, 134 L. Ed. 2d 809, 826 (1996).

Drizin's actions with respect to plaintiff's money were both outrageous and malicious. As a result of Drizin's tortious conduct, good people were hurt. GSI, Ubani, and Drizin lured the plaintiff to hand over its money, ensuring that it would be invested safely and, even then, only with plaintiff's prior written permission. Drizin immediately, and then repeatedly, abused that special trust. The evidence is clear, convincing, and

satisfactory that punitive damages are appropriate in this case to punish Drizin and to deter others from engaging in similar conduct.

## CONCLUSION

Drizin's actions with respect to plaintiff's money were duplicitous, fraudulent, and negligent. GSI was created for and served no other purpose than to perpetuate fraud and, unfortunately for the plaintiff, its path crossed with GSI. GSI was woefully undercapitalized and engaged in no legitimate business transactions whatsoever. Ultimately, it was Drizin who played fast and loose with plaintiff's money, moving it from bank to bank, investing it in one failed "deal" after another, and spending it himself until there was nothing left. Drizin is liable for these actions.

Upon the foregoing,

IT IS ORDERED

That the Clerk of Court for the Northern District of Iowa shall enter judgment in favor of the plaintiff and against Defendant Drizin in the amount of Eleven Million Four Hundred Thousand Dollars ($11,400,000.00). Pre-judgment interest on the Three Million Eight Hundred Thousand Dollars ($3,800,000.00) in compensatory damages shall run from November 13, 2001, at the rate provided by Iowa law for tort judgments. The Clerk of Court shall also enter judgment for post-judgment interest and the plaintiff's costs.

February 7, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT